HON. JOHN C. COUGHENOUR

Richard A. Smith, WSBA #21788
Brian A. Knutsen, WSBA # 38806
Smith & Lowney, PLLC
2317 East John Street
Seattle, Washington 98112
Phone: (206) 860-2883
Fax: (206) 860-4187

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILD FISH CONSERVANCY,    ) | No. 2:08-CV-00156-JCC |
|    ) | |
|      Plaintiff,    ) | FIRST AMENDED COMPLAINT FOR |
|    ) | DECLARATORY AND INJUNCTIVE |
| v.    ) | RELIEF |
|    ) | |
| UNITED STATES ENVIRONMENTAL    ) | |
| PROTECTION AGENCY; STEPHEN L.    ) | |
| JOHNSON; ELIN D. MILLER;    ) | |
| NATIONAL MARINE FISHERIES    ) | |
| SERVICE; CARLOS M. GUTIERREZ;    ) | |
| and JAMES W. BALSIGER,    ) | |
|    ) | |
|      Defendants,    ) | |
| _____) | |

**INTRODUCTION**

1.      This action challenges the failure of defendant United States Environmental

Protection Agency ("EPA") to take action required of it under the Clean Water Act, 33 U.S.C. §§

1251 *et al.* ("CWA"), to approve or disapprove a change to state water quality standards

submitted to it for review by the Washington Department of Ecology ("Ecology") more than

eleven years ago.  The regulation comprising this change to state water quality standards

FIRST AMENDED COMPLAINT- 1
No. 2:08-CV-00156-JCC

facilitates Ecology's issuance of permits that allow the operation of Atlantic Salmon net pen facilities in the Puget Sound.  Plaintiff Wild Fish Conservancy, concerned about the ecological effects of these net pen facilities, including threats to native fish and the habitats on which they depend, as well as the EPA's failure to fulfill its oversight obligations under the CWA, seek declaratory and injunctive relief requiring the EPA to take the action that the CWA requires, as well as recovery of litigation expenses, including reasonable attorney fees, as provided by the CWA citizen suit provision.

2.     This action also challenges agency action taken by defendant the National Marine Fisheries Service ("NMFS") in violation of the Endangered Species Act, 16 U.S.C. §§ 1531 *et al.* ("ESA").  NMFS has concurred under Section 7 of the ESA, 16 U.S.C. § 1536, with EPA's determination that EPA's proposed approval of Ecology's change to state water quality standards described in paragraph 1 above may affect but is not likely to adversely affect species protected under the ESA.  NMFS's concurrence is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  Plaintiff Wild Fish Conservancy is concerned about the ecological effects of these net pen facilities, including threats to native fish resulting from sea lice infestations at net pens, and seeks declaratory and injunctive relief requiring NMFS to fulfill its obligation to conduct formal consultation under Section 7 of the ESA and issue a biological opinion evaluating the effects of EPA's proposed approval of Ecology's change to state water quality standards.  Plaintiff Wild Fish Conservancy further seeks recovery of litigation expenses, including reasonable attorney fees, as provided by the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq*.

FIRST AMENDED COMPLAINT- 2
No. 2:08-CV-00156-JCC

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the CWA claims under 33 U.S.C. § 1365(a), and may order the EPA Defendants to perform nondiscretionary duties under this section.  As required by the CWA citizen suit provision, 33 U.S.C. 1365(b)(2), Plaintiff provided sixty days notice of its intent to sue through a letter dated and postmarked November 30, 2007.  A copy of that letter is attached as **Exhibit A** to this First Amended Complaint.  Venue is appropriate in this judicial district because Defendant EPA has its Region 10 office in this district and this is the office to which Ecology submitted the proposed change of water quality standard for review.

4.      This Court has jurisdiction over the ESA claims under 5 U.S.C. §§ 701-706 (Administrative Procedure Act) and 28 U.S.C. § 1331 (federal question).  The requested relief is also proper under 28 U.S.C. § 2201 (declaratory relief) and 28 U.S.C. § 2202 (injunctive relief). The Western District of Washington is the proper venue under 28 U.S.C. § 1391(e) because EPA has its Region 10 office in this district, which requested the concurrence in its determination that the proposed agency action is not likely to adversely affect species protected under the ESA, and because NMFS has its Northwest Regional Office here, which issued the challenged concurrence, which are substantial parts of the events and omissions giving rise to the ESA claim.

## PARTIES

5.      Plaintiff Wild Fish Conservancy, formerly known as Washington Trout, is a statewide, non-profit, nonpartisan organization devoted to protection of fish resources in the State of Washington.  Its principal office is located in Duvall, Washington.  Since its founding in 1989, Wild Fish Conservancy has engaged in scientific research, educational, and advocacy

FIRST AMENDED COMPLAINT- 3
No. 2:08-CV-00156-JCC

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

activities to further the science and policy supporting conservation of biologically diverse fish resources. Wild Fish Conservancy has approximately two thousand individual members.

6. Plaintiff's members use and enjoy rivers, streams, bays, passages, and other bodies of water throughout the Puget Sound and its basin, for recreational, scientific, aesthetic, and commercial purposes. Plaintiff's members derive recreational, scientific, aesthetic, and commercial benefits from the existence of healthy aquatic and marine systems and wild salmonids and other fish through water recreation, wildlife observation and study, photography, and fishing. Plaintiff's members' enjoyment of these benefits is being and will continue to be harmed by the EPA Defendants' failure to take the action that is the subject of this lawsuit and by the NMFS Defendants' violation of the ESA. In these and other ways, Plaintiff has suffered injury that is fairly traceable to the actions, or lack thereof, complained of, and that can be remedied by an order available from this Court.

7. Defendant EPA is the federal agency charged with administering the CWA, 33 U.S.C. §§ 1251 *et seq.*

8. Defendant Stephen L. Johnson is the Administrator of the EPA.

9. Defendant Elin D. Miller is the Administrator of Region 10 of EPA, based in Seattle, Washington.

10. Defendant NMFS is a federal agency within the executive branch and a sub-agency within the National Oceanic and Atmospheric Administration, which itself is a sub-agency within the United States Department of Commerce. Defendant NMFS is charged with administering the ESA.

11. Defendant James W. Balsiger is the Acting Assistant Administrator of the NMFS.

FIRST AMENDED COMPLAINT- 4
No. 2:08-CV-00156-JCC

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

12.     Defendant Carlos M. Gutierrez is the Secretary of the United States Department of Commerce.

**BACKGROUND**

I.     **The Legal Framework**.

    A.     **The Clean Water Act**.

13.     The objective of the CWA is to restore and maintain the chemical, physical, and biological integrity of the nation's waters.  33 U.S.C. § 1251(a).  To achieve this objective, it declares, among other things, that it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985, and that it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983. *Id.*

14.     Central to achievement of the objectives of the CWA are the establishment and attainment of water quality standards.  33 U.S.C. § 1313.  "A water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses."  40 C.F.R. § 131.2.  "Water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses.  Water quality standards are to protect the public health or welfare, enhance the quality of water and serve the purposes of the [CWA]."  40 C.F.R. § 131.3(i).

15.     The protection and attainment of water quality standards are key requirements for the issuance of permits under the National Pollutant Discharge Elimination System ("NPDES"), established to regulate point source discharges of pollutants and required for each such

FIRST AMENDED COMPLAINT- 5
No. 2:08-CV-00156-JCC

discharge.  33 U.S.C. §§ 1311(a) and (b)(1)(C), 1312, 1342(a)(1) and (b)(1)(A); 40 C.F.R. §§ 122.4(d) and 122.44(d).  In addition, the protection and attainment of water quality standards are important requirements and prerequisites for many other activities and programs established by the CWA.  *E.g.,* 33 U.S.C. § 1313(d) (program to identify waters not attaining standards and requirement to develop plans to achieve attainment).

16.     The CWA requires states to periodically review and revise water quality standards applicable to waters within their boundaries.  33 U.S.C. § 1313(c); 40 C.F.R. § 131.20.  If a state revises or adopts a new water quality standard, the revised or new standard must be submitted to EPA for review.  33 U.S.C. § 1313(c)(2); 40 C.F.R. § 131.20.  EPA has established a list of required elements that must accompany a state's submission for review of a revised or new standard.  40 C.F.R. § 131.6.

17.     Once the state submits the revised or new standard to EPA, EPA must either approve or disapprove the standard.  33 U.S.C. § 1313(c)(3).  If EPA determines that the standard meets the requirements of the CWA and is approved, it must do so within sixty days of the state's submission of the standard.  *Id.*; 40 C.F.R. § 131.21(a)(1).  If EPA determines that the standard does not meet the requirements of the CWA and is disapproved, it must do so within ninety days of the state's submission of the standard.  33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21(a)(2).  In the case of disapproval, EPA must also notify the state with specificity the changes to the revised or new standard needed to assure compliance with the requirements of the CWA.  33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21(a)(2).  In such case, if the state does not adopt the changes specified by EPA within ninety days, EPA must promptly propose a revised or new standard that satisfies the statutory requirements and then promulgate it, within ninety days

FIRST AMENDED COMPLAINT- 6
No. 2:08-CV-00156-JCC

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

of its proposal as a regulation, as a water quality standard for the state.  33 U.S.C. § 1313(c)(3)

and (4); 40 C.F.R. § 131.22.

18.     States may include in their state water quality standards policies generally

affecting the application of the standards, such as mixing zones, low flows, and variances.  40

C.F.R. § 131.13.  Such policies are subject to the EPA review process described above.  *Id*.

**B.     The Endangered Species Act.**

19.     The ESA declares it to be the policy of the United States to preserve to the extent

practicable the various species of fish, wildlife and plants facing extinction.  16 U.S.C. §

1531(a)(4).

20.     In furtherance of these objectives, Section 7 of the ESA mandates that each

federal agency, in consultation with NMFS (or, depending on impacted species, the United

States Fish and Wildlife Service), ensure that any action authorized, funded, or carried out by the

agency is not likely to jeopardize the continued existence of an endangered or threatened species.

16 U.S.C. § 1536(a)(2).  Federal agencies are required to use the "best scientific and commercial

data available" in fulfilling these requirements.  *Id*.

21.     If an agency action "may affect" species protected under the ESA, the agency is

required to initiate formal consultation with NMFS.  50 C.F.R. § 402.14.  An agency initiates

formal consultation by submitting a written request and a biological assessment to NMFS.  50

C.F.R. § 402.14(c).  Formal consultation is concluded by NMFS's issuance of a biological

opinion determining whether the proposed agency action is likely to jeopardize the continued

existence of an ESA protected species.  50 C.F.R. § 402.14(h)(3).

22.     If, at the conclusion of formal consultation, NMFS determines that the proposed

agency action is not likely to jeopardize the continued existence of ESA listed species, or that

FIRST AMENDED COMPLAINT- 7
No. 2:08-CV-00156-JCC

reasonable and prudent alternatives to the proposed action will not result in such jeopardy, and that any taking of listed species incidental to the proposed action will not violate Section 7(a)(2) of the ESA, NMFS must issue an incidental take statement with its biological opinion.  16 U.S.C. § 1536(b)(4).  The incidental take statement includes reasonable and prudent measures considered by NMFS as necessary or appropriate to minimize impacts on ESA listed species.  16 U.S.C. § 1536(b)(4)(C)(ii); 50 C.F.R § 402.14(i)(1).

23.    If, during informal consultation with NMFS, an agency determines that a proposed action is not likely to adversely affect ESA protected species, and NMFS issues a written concurrence in this determination, the consultation requirements of Section 7 of the ESA are fulfilled and formal consultation is not required.  50 C.F.R. § 402.13(a).

II.    **Factual Background.**

A.    **Washington's regulatory program and submission of changed water quality standards.**

24.    The State of Washington has established a federally approved state NPDES program administered by Ecology.  WASH. REV. CODE § 90.48.260; WASH. ADMIN. CODE ch. 173-220.  This program was approved by EPA under 33 U.S.C. § 1342(b).

25.    EPA initially approved Washington's Sediment Management Standards, WAC Ch. 173-204, as part of Washington's water quality standards under 33 U.S.C. § 1313(c) in 1991.

26.    In 1993, the Washington State Legislature enacted RCW 90.48.220, which directed Ecology to adopt standards and criteria specifically for salmon net pens.  The Legislature took this action to require changes in the state water quality standards so that salmon net pens could receive NPDES permits from Ecology, as well as other authorizations requiring

FIRST AMENDED COMPLAINT- 8
No. 2:08-CV-00156-JCC

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

compliance with water quality standards, that would allow the salmon net pens to operate without what was perceived to be excessive costs for environmental regulation.

27.    In response to this legislation, on December 31, 1995, Ecology adopted revisions to WAC Ch. 173-204, including the enactment of WAC 173-204-412, which specifically addresses regulation of net pen discharges and allowable effects and required monitoring for sediment and other benthic effects.  The regulation expressly exempts net pens and associated discharges from substantial portions of the sediment management standards, including limitations on sediment impact zones.  The revised WAC Ch. 173-204 includes other revisions, which also constitute revised and/or new water quality standards.

28.    On June 3, 1996, Ecology submitted its revisions to WAC 173-204 to the EPA for review as revised and/or new water quality standards.  *See* **Exhibit B**, *Submission Letter*.

**B.    Atlantic Salmon net pens.**

29.    The environmental effects of Atlantic salmon net pens are highly controversial. *See, e.g*., http://www.adfg.state.ak.us/special/as/as_home.php *and* http://www.davidsuzuki.org/Oceans/Aquaculture/Salmon/default.asp.  Net pens are floating facilities that contain young and mature salmon in permeable enclosures, such as netting, in open water.  Young salmon are placed in these net pens, given feed and antibiotics and other medications and treatments as necessary, raised to marketable size, and harvested for commercial sale.  Due to characteristics conducive to commercial success, Atlantic salmon are the primary species raised in net pens.  There are scores of Atlantic salmon net pens in British Columbia.  Scientific studies have begun to document the extent of the ecological threats presented by the operation of Atlantic salmon net pens.  These threats include: escapement and colonization by Atlantic salmon as exotic species; breeding and transmission to wild fish,

FIRST AMENDED COMPLAINT- 9
No. 2:08-CV-00156-JCC

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

including native salmonids, of diseases and parasites, including sea lice; and the smothering of the benthic layer in the vicinity of the net pens by the waste food, fish feces, and other pollutants discharged by the net pens.  Due to these concerns, the State of Alaska has banned Atlantic salmon net pens from waters within its jurisdiction.  AS 16.40.210.

30.     There are currently eight Atlantic Salmon net pens in the Puget Sound and all of their discharges are authorized by NPDES permits issued by Ecology.  These eight net pens are situated at or about the following locations: Clam Bay adjacent to Rich Passage near Manchester, Washington; Fort Ward northwest of Beans Point in Rich Passage near Bainbridge Island; Rich Passage south of Orchard Rocks near Bainbridge Island; Deepwater Bay near Cypress Island; three in Deepwater Bay in the Bellingham Channel near Cypress Island; Skagit Bay near Hope Island; and northeast of Port Angeles Harbor south of Ediz Hook.  The exemptions and other provisions of WAC 173-204-412 are incorporated into these NPDES permits.

**C.     Sea lice and the threat to ESA protected species.**

31.     Sea lice are small marine parasites commonly associated with salmon species. Sea lice latch onto wild salmon in the open ocean to feed on mucus, scales, muscle tissue and blood of the host fish.  This can cause osmotic stress and emaciation, leading to mortality to a sufficiently infected host.  Adult salmon are able to tolerate a small number of sea lice. However, juvenile salmon migrating from fresh waters to the open ocean are very small, thin-skinned, and therefore particularly vulnerable to sea lice.

32.     Sea lice occurrences on adult wild salmon in natural conditions are somewhat common.  However, because sea lice cannot tolerate fresh water, sea lice drop off salmon as they return to natal freshwater bodies to spawn.  Sea lice occurrences on juvenile salmon in the natural environment are believed to be rare in part because infected adult salmon are not

FIRST AMENDED COMPLAINT- 10
No. 2:08-CV-00156-JCC

SMITH & LOWNEY, P.L.L.C.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

naturally present in the near shore marine environment during times when juvenile salmon are migrating to open sea.

33.     Salmon net pens concentrate adult salmon in the near shore marine environment year round, which can increase the number of sea lice present.  This can be devastating to juvenile salmon that migrate past the net pens to reach the open ocean.

**D.     EPA's failure to act.**

34.     To date, EPA Defendants have not approved or disapproved the revised and/or new water quality standards included in WAC 173-204, submitted to EPA on June 30, 1996, nor taken any other action as required by 33 U.S.C. § 1313(c) or 40 C.F.R. § 131.21.

35.     In 1996 and again in 2000, EPA corresponded with the NMFS and the United States Fish and Wildlife Service about initiating consultation as required under the ESA, 16 U.S.C. § 1536, on action that it might take to approve or disapprove the revised and/or new water quality standards in WAC 173-204, but such consultation was not undertaken at that time.

36.     The only document appearing in the file on WAC 173-204 provided to Plaintiff by EPA in response to Plaintiff's Freedom of Information Act Request that is dated later than 2000 is a memorandum asserting that EPA will not be taking action on the "July 26, 1996," submission of the WAC 173-204 revisions because Ecology's submission lacked the "certification by the State Attorney General or other appropriate legal authority within the State that the water quality standards were duly adopted pursuant to State law," as 40 C.F.R. § 131.6(e) requires of such a submission.  This memorandum, attached as **Exhibit C**, bears the same date, November 30, 2007, that Plaintiff's notice of intent to sue was placed in the mail to EPA Defendants.

FIRST AMENDED COMPLAINT- 11
No. 2:08-CV-00156-JCC

37.     As indicated by Ecology's June 3, 1996, letter covering the submission of the revised and/or new water quality standards included in the revised WAC 173-204, the central assertion of EPA's "November 30, 2007" memorandum is incorrect.  *See* **Exhibit B**.  The submission did include the certification by the State Attorney General necessary to satisfy the requirements of 40 C.F.R. § 131.6(e).  **Exhibit D**.

**E.      NMFS's violation of Section 7 of the ESA.**

38.     After the filing of the initial Complaint in this matter, on approximately April 17, 2008, the EPA submitted a biological evaluation to the NMFS determining that the EPA's proposed approval of Ecology's revised and/or new water quality standards included in WAC 173-204 may affect but is not likely to adversely affect Chinook Salmon (Puget Sound ESU), Chum Salmon (Hood Canal summer-run ESU) and Steelhead (Puget Sound DPS), all of which are protected under the ESA.  The biological evaluation requested that NMFS concur in EPA's determination under Section 7 of the ESA, 16 U.S.C. § 1536, and 50 C.F.R. § 402.13(a).

39.     On or about June 9, 2008, NMFS issued a written concurrence in EPA's determination that the proposed approval of Ecology's revised and/or new water quality standards included in WAC 173-204 may affect but is not likely to adversely affect Chinook Salmon (Puget Sound ESU), Chum Salmon (Hood Canal summer-run ESU) and Steelhead (Puget Sound DPS).  The issuance of NMFS's concurrence concluded the consultation process required under Section 7 of the ESA.  *See* 50 C.F.R. § 402.13(a).

40.     In determining that the proposed action may affect but is not likely to adversely affect ESA protected species, EPA's biological evaluation stated: "Although sea lice has been a major concern and topic of research in British Columbia, Puget Sound has not experienced the same sea lice issues due to water salinity and temperature.  [The National Oceanic and

FIRST AMENDED COMPLAINT- 12
No. 2:08-CV-00156-JCC

Atmospheric Administration] states that the use of pharmaceuticals to control sea lice in Washington State has not been used for over 15 years since there have not been significant problems."  EPA cites to a single source in support of its conclusion, "The Net-pen Salmon Farming Industry in the Pacific Northwest," Colin Nash (September, 2001), a technical memorandum prepared by the National Oceanic and Atmospheric Administration.

41.     NMFS summarily cited to the Nash technical memorandum in its written concurrence in EPA's determination that the proposed action may affect but is not likely to adversely affect Chinook Salmon, Chum Salmon, or Steelhead.

42.     The Nash technical memorandum does not evaluate the temperature and salinity needs for sea lice during its various life history stages, nor does it even look at the temperature and salinity values found in Puget Sound.  NMFS failed to compare the salinity and temperature needs of sea lice to readily available salinity and temperature data for the Puget Sound areas where the Atlantic Salmon net pens are located.  Additionally, NMFS ignored studies that demonstrate that sea lice occurring at aquaculture net pens can harm wild juvenile salmon while not being severe enough to justify the expenditures associated with pharmaceutical treatments at Atlantic Salmon net pens.

43.     Readily available research and data demonstrate that Puget Sound provides habitable conditions for sea lice.  Sea lice are able to reproduce at temperatures as low as 7°C, although warmer temperatures of around 12°C enable a greater percentage of viable eggs. Sporadic temperature data is available for Puget Sound for the time period of 1979 through 2007 through the EPA's own STORET database.  *Available at* http://www.epa.gov/STORET/dbtop.html.  Of the data available through this source, 99.6% of

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

the observations were warmer 10°C.  *See* **Exhibit E**, *Figure Showing Temperature Range in Puget Sound*.  Sea lice survival is diminished at salinity levels below 15 parts per thousand ("ppt"), with optimal salinity levels around 30 ppt.  Salinity data for Puget Sound is available for the time period of 1932 through 1987 through the same database maintained by EPA.  *Available at* http://www.epa.gov/STORET/dbtop.html.  This data shows that salinity levels in Puget Sound provide habitable conditions for sea lice.  *See* **Exhibit F**, *Salinity Conditions in Puget Sound from 1932 to 1987*.

44.     NMFS failed to consider the best scientific and commercial data available regarding the threats posed by sea lice to ESA protected species, and its concurrence in EPA's determination that the proposed action may affect but is not likely to adversely affect ESA listed species is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

## CAUSES OF ACTION

## I.    <u>EPA's Failure to Perform a Nondiscretionary Duty.</u>

45.     The CWA requires the EPA Defendants to take action to approve or disapprove, within specified time frames, revised or new water quality standards proposed by the states as described in paragraphs 16-17 above.  The EPA Defendants have failed to take any action as required by 33 U.S.C. § 1313(c) and as described by 40 C.F.R. § 131.21 with respect to the revised and new water quality standards contained in WAC 173-204 and submitted by Ecology to the EPA Defendants on or about June 3, 1996.

46.     The EPA Defendants have thus violated the requirements of 33 U.S.C. § 1313(c) and failed to perform a nondiscretionary duty.  This violation is reviewable and subject to remedy under 33 U.S.C. § 1365(a).

FIRST AMENDED COMPLAINT- 14
No. 2:08-CV-00156-JCC

II.  **NMFS's Violation of Section 7 of the ESA.**

47.     NMFS has violated the requirements of Section 7 of the ESA, 16 U.S.C. § 1536, and its implementing regulations by concluding that EPA's proposed approval of Ecology's revised and/or new water quality standards contained in WAC 173-204 may affect but are not likely to adversely affect species protected under the ESA.  In reaching this determination, NMFS failed to consider the best scientific and commercial data available.  NMFS's determination is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

48.     NMFS's actions are arbitrary, capricious, an abuse of discretion, and not in accordance with law and are reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(a)     Issue a declaratory judgment declaring that EPA Defendants have violated the Clean Water Act, 33 U.S.C. § 1313(c);

(b)     Issue a mandatory injunction requiring EPA Defendants to take action on the Washington Department of Ecology's submission of WAC 173-204 in the manner described by 40 C.F.R. § 131.21, or as otherwise appropriate, and within a specified time period;

(c)     Issue a declaratory judgment declaring that NMFS Defendants are in violation of Section 7 of the Endangered Species Act and its implementing regulations by failing to ensure that the EPA's proposed approval of Ecology's revised and/or new water quality standards contained in WAC 173-204 are not likely to jeopardize the continued existence of species protected under the ESA.

FIRST AMENDED COMPLAINT- 15
No. 2:08-CV-00156-JCC

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

(d)     Issue a declaratory judgment declaring that NMFS Defendants' determination that EPA's proposed approval of Ecology's revised and/or new water quality standards contained in WAC 173-204 is not likely to adversely affect species protected under the ESA is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

(e)     Issue a mandatory injunction requiring NMFS Defendants to prepare a biological opinion, and also requiring NMFS Defendants to prepare an incidental take statement if NMFS determines that EPA's proposed approval of Ecology's revised and/or new water quality standards contained in WAC 173-204 is not likely to jeopardize the continued existence of species protected under the ESA nor result in the destruction or adverse modification of such species' critical habitat.

(e)     Allow Plaintiff to recover the costs of this action, including attorneys fees, under the Clean Water Act, 33 U.S.C § 1365(d), and the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*; and

(f)     Grant such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 5th day of September, 2008.

Smith & Lowney, pllc

By:  s/ Brian A. Knutsen
    Richard A. Smith, WSBA # 21788
    Brian A. Knutsen, WSBA # 38806
Attorneys for Plaintiffs
2317 E. John Street, Seattle, WA 98112
Tel: (206) 860-2883; Fax: (206) 860-4187
Email: rasmithwa@igc.org; briank@igc.org

FIRST AMENDED COMPLAINT- 16
No. 2:08-CV-00156-JCC

EXHIBIT A

## SMITH & LOWNEY, P.L.L.C.

2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883, FAX (206) 860-4187

November 30, 2007

**Via Certified Mail - Return Receipt Requested**
Administrator Stephen L. Johnson
United States Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

**Via Certified Mail – Return Receipt Requested**
Regional Administrator Elin Miller
United States Environmental Protection Agency, Region 10
1200 Sixth Ave.
Seattle, WA 98101

Re:    **NOTICE OF INTENT TO FILE SUIT UNDER THE CLEAN WATER ACT**

Dear Administrator Johnson and Regional Administrator Miller:

We represent Wild Fish Conservancy, P.O. Box 402, Duvall, WA 98019, (425)788-1167. Any response or correspondence related to this matter should be directed to us at the letterhead address. This letter is to provide you with sixty days' notice of Wild Fish Conservancy's intent to sue and the Environmental Protection Agency under Section 505(a)(2) of the Clean Water Act, 33 USC § 1365(a)(2).

Section 505(a)(2) authorizes citizen suit against the Administrator of EPA when he has failed to perform any act or duty under the CWA that is not discretionary. 33 USC § 1365(a)(2). Section 303(c) of the CWA, 33 USC § 1313(c), requires the Administrator to act within a specified time period when a state submits to EPA a new or revised water quality standard. Specifically, Section 303(c)(3), 33 USC § 1313(c)(3), requires the Administrator to determine within sixty days of the state's submission whether such new or revised standard meets the requirements of the CWA. If the Administrator determines that such new or revised standard is not consistent with the applicable requirements of the CWA, this section requires him to notify the state of such determination and to specify the changes necessary to meet these requirements. Such notification of a non-consistency determination and specification of necessary changes must be made not later than the ninetieth day after the date of the state's submission. 33 USC § 1313(c)(3).

EPA regulations further explain these duties:

After the State submits its officially adopted revisions, the Regional
Administrator shall either:

(1) Notify the State within 60 days that the revisions are approved, or

(2) Notify the State within 90 days that the revisions are disapproved. Such
notification of disapproval shall specify the changes needed to assure
compliance with the requirements of the Act and this regulation, and shall
explain why the state standard is not in compliance with such requirements. ...

40 CFR § 131.21(a).

The regulations also define "water quality standards":

*Water quality standards* are provisions of State or Federal law which consist of
a designated use or uses for the waters of the United States and water quality
criteria for such waters based upon such uses. Water quality standards are to
protect the public health or welfare, enhance the quality of water and serve the
purposes of the Act.

40 CFR § 131.3(i).

States' general policies about application and implementation of the water quality
standards are also subject to review under Section 303(c):

States may, at their discretion, include in their State standards, policies
generally affecting their application and implementation, such as mixing zones,
low flows and variances. Such policies are subject to EPA review and
approval.

40 CFR § 131.13.

On or about June 3, 1996, the Washington State Department of Ecology submitted to
EPA revisions to the state's Sediment Management Standards, Chapter 173-204 of the
Washington Administrative Code, for EPA review under 40 CFR § 131. The revisions are
primarily the state's adoption of WAC 173-204-412, titled "Marine finfish rearing facilities,"
and constitute new or revised water quality standards, requiring your approval or disapproval
and appropriate notification to the state. EPA has taken no action to approve or disapprove
the revisions, or to provide the required notification to the state, or to specify changes
necessary for approval. You and EPA have thus failed to perform the nondiscretionary duty
required by Section 303(c), 33 USC § 1313(c), and 40 CFR § 131.21(a).

Wild Fish Conservancy believes that this NOTICE OF INTENT TO SUE sufficiently
states grounds for filing suit. We intend, at the close of the 60-day notice period, or shortly
thereafter, to file a citizen suit against you and EPA under Section 505(a) of the Clean Water

Act for the failure to perform the duties described herein and set forth in Section 303 of the Act and 40 CFR § 131.

During the 60-day notice period, we would be willing to discuss effective remedies for the failures described in this letter and settlement terms. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within 10 days of receiving this notice so that a meeting can be arranged and so that negotiations may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint if discussions are continuing when the notice period ends.

Very truly yours,

SMITH & LOWNEY, P.L.L.C.

By: Richard A. Smith

cc:   Attorney General Michael B. Mukasey, United States Department of Justice, 950 Pennsylvania Ave., N.W., Washington, DC 20530-0001



EXHIBIT B

STATE OF WASHINGTON

# DEPARTMENT OF ECOLOGY

*P.O. Box 47600 • Olympia, Washington 98504-7600*
*(360) 407-6000 • TDD Only (Hearing Impaired) (360) 407-6006*
June 3, 1996

Phillip Millam
Regional Administrator
U.S. Environmental Protection Agency (EPA)
Region X
1200 Sixth Avenue
MS OW-135
Seattle, WA 98101



R E C E I V E D
JUL 2 6 1996
U.S. EPA REGION 10
WATER

Dear Mr. Millam:

On December 31, 1995, the Department of Ecology (Ecology) adopted revisions to the State's Sediment Management Standards (SMS), Chapter 173-204 of the Washington Administrative Code (WAC). Revisions to the rule included adding a new section of regulatory standards for Marine Finfish Rearing Facilities and incorporating public comments and latest scientific developments from a triennial review on the SMS rule.

In accordance with federal regulations (40 CFR 131), Ecology hereby submits the revised regulation (enclosed) for EPA approval. Additionally, the following supporting documentation has been enclosed for your review of the revised SMS.

▶ Certification by the State Attorney General;

▶ Chronology of Revision Process;

▶ State Environmental Policy Act (SEPA) compliance for Marine Finfish Rearing Facilities: Amendment Section to the Sediment Management Standards, Chapter 173-204;

▶ Small Business Economic Impact Statement for Marine Finfish Rearing Facilities: Amendment Section to the Sediment Management Standards, Chapter 173-204; and

▶ Responsiveness Summary for Amendment to Sediment Management Standards, Chapter 173-204.

In addition, I have enclosed a technical reference list titled "Bibliography" which includes multiple technical support documents related to the development of the revised rule. Many

EPA memo
Review of amended SMS Rule
Page 2

of these documents were developed in consultation with your staff.  Please advise us if any
of these technical documents are needed for your review of the revised rule.

There are still a number of additional rule development activities to be completed in 1996-
1997.  These activities include:

> Development of human health sediment criteria which are currently "reserved" in
  the SMS;

> Development of freshwater sediment criteria which are currently "reserved" in
  the SMS; and

> Revised interpretation methods for benthic community criteria to improve the
  identification of adverse effects.

We appreciate the efforts your staff have provided during the development of the revised
SMS rule and we look forward to continued close cooperation in the ongoing
implementation of this program.  Should you have any questions, you may call Pamela
Sparks-McConkey at (360) 407-6491.

Sincerely,

Greg Sorlie
Program Manager
Central Programs

Enclosures  (7.)

cc/enc:       Sally Marquis, Unit Manager of Water Quality Standards/TMDL
              John Malek, Aquatic Resources Unit

EXHIBIT C



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 10**
1200 Sixth Avenue
Seattle, WA 98101

NOV 3 0 2007

Reply to
Attn Of: OWW-131

**MEMORANDUM**

RE: EPA's Basis for No Clean Water Act Action on Washington's Revised Sediment
Management Standards, Chapter 173-204 of Washington's Administrative Code (1996).

From:  Jannine Jennings

To: The Record

On July 26, 1996, EPA Region 10 received a letter from Greg Sorlie, Program Manager,
Central Programs, State of Washington Department of Ecology submitting revisions to
the State's Sediment Management Standards (SMS), Chapter 173-204 of the State's
Administrative Code. EPA has reviewed the material submitted and has determined the
package to be incomplete. Therefore EPA will not be taking an action under CWA
Section 303(c) on this submittal

EPA's regulations identify the minimum requirements for water quality standard
submissions, including "certification by the State Attorney General or other appropriate
legal authority within the State that the water quality standards were duly adopted
pursuant to State law" (40 CFR 131.6(e)). Although the letter received by EPA cites an
enclosed certification by the State Attorney General, EPA does not have a copy of this
document. EPA has contacted Washington Department of Ecology and has not been able
to obtain a copy of this document. Consequently, EPA is not taking action on the SMS
revisions as the submittal does not have the required certification by the State Attorney
General, as required by 40 CFR 131.6(e).

EXHIBIT D

Christine O. Gregoire

# ATTORNEY GENERAL OF WASHINGTON

Ecology Division

629 Woodland Square Loop SE 4th Floor • Lacey WA 98503
Mailing Address: PO Box 40117 • Olympia WA 98504-0117

July 23, 1996

Phillip Millam
Regional Administrator
U.S. Environmental Protection Agency (EPA)
Region X
1200 Sixth Avenue MS: OW-135
Seattle, WA 98101

> Re: Attorney General Certification of Sediment
> Management Standards, Chapter 173-204 WAC

Dear Mr. Millam:

This letter will advise and certify to you that the amendments to the Sediment Management Standards, chapter 173-204 WAC, regarding allowable sediment impacts from organic enrichment due to marine finfish rearing facilities, were adopted by the Department of Ecology (Ecology) on December 29, 1995. A revised version of chapter 173-204 WAC is included as an attachment.

The Sediment Management Standards, as amended by Ecology, conform to state law and were lawfully adopted under the provisions of Washington's Administrative Procedure Act, Chapter 34.05 RCW. The Sediment Management Standards as amended are codified under chapter 173-204 WAC, and the amendments became legally enforceable under state law as of January 29, 1996.

Very truly yours,

*Mary Sue Wilson*

MARY SUE WILSON
Assistant Attorney General
(360) 459-6057

MSW:mab
f:cases\mxw\EPA\ltr

Attachment

cc: Sally Marquis, Manager, Water Quality Standards
    John Malek, Aquatic Resources Unit
    Dave Bradley, Ecology Central Programs
    Greg Sorlie, Manager, Ecology Central Programs

EXHIBIT E



Temperature ranges in Puget Sound for observations made between 1979 and 2007.

EXHIBIT F

**Puget Sound**
Salinity Sampling

