The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILD FISH CONSERVANCY, | C08-0156-JCC |
| Plaintiff, | |
| v. | **ORDER** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
| Defendants, | |
| and | |
| ICICLE ACQUISITION SUBSIDIARY LLC, d.b.a. AMERICAN GOLD SEAFOODS, | |
| Intervenor. | |

This matter comes before the Court on Plaintiff's motion for summary judgment (Dkt. No. 52), and Defendants' cross-motion for summary judgment. (Dkt. No. 59). With respect to Plaintiff's motion, the Court has also considered Intervenor's response (Dkt. No. 56), Federal Defendants' response (Dkt. No. 59), and Plaintiff's reply. (Dkt. No. 62). With respect to Defendants' cross-motion, the Court has also considered Plaintiff's response (Dkt. No. 62), and Defendants' reply. (Dkt. No. 65).

After carefully considering these submissions along with the parties' supporting declarations and exhibits, the Court has determined that oral argument is unnecessary. For the reasons explained below, the Court hereby GRANTS Plaintiff's motion, DENIES Defendants' cross-motion, and rules as follows.

## I. INTRODUCTION

Plaintiff filed this lawsuit in January 2008, arguing that the Environmental Protection Agency (EPA) and the National Marine Fisheries Service violated the Clean Water Act and the Endangered Species Act by approving Washington State regulations which exempt Puget Sound salmon farms from general sediment-management standards. (*See* Second Amended Complaint 19–21 (Dkt. No. 27)). Plaintiff argues that the EPA violated the Clean Water Act by approving regulations that are inconsistent with the Act's requirements, and that both agencies violated the Endangered Species Act by ignoring the best scientific and commercial data when they engaged in an interagency consultation process. Plaintiff points with particular force to data about sea lice and the hazards they create for wild fish. (*See id.* 12–18). According to Plaintiff, the EPA and the Fisheries Service ignored scientific literature tending to show that sea lice are likely to adversely affect native species of fish like the Chinook salmon, Chum salmon, and Steelhead trout. (*Id.* 16–17).

## II. STATUTORY AND REGULATORY FRAMEWORK

### A. Clean Water Act

Congress passed the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act prohibits any person from discharging any pollutant into protected waters, *id.* § 1311(a), unless the person first secures a discharge permit from the EPA. *See id.* § 1342; *see also* 40 C.F.R. § 122 (implementing the National Pollutant Discharge Elimination System, and listing requirements for permits). Each of the fifty states is required to periodically establish water-quality standards, which it must then submit to the EPA for review. *See* 33 U.S.C. § 1313(c). The Agency must either approve the proposed standards, or disapprove them and notify the state of required changes. *Id.* § 1313(c)(3). If the EPA rejects a state's proposed water-quality standards and the state fails to adopt the required changes within ninety days, the Agency itself promulgates the standards. *Id.* § 1313(c)(4).

**B.     Endangered Species Act**

Congress enacted the Endangered Species Act in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[.]" 16 U.S.C. § 1531(b). The Act requires any federal agency contemplating action to consult with the appropriate federal environmental oversight body "to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species, or result in the destruction or adverse modification of [critical] habitat." *Id.* § 1536(a)(2). In this case, the appropriate federal environmental body was the Fisheries Service, and the applicant agency was the EPA.

Consultation between the Fisheries Service and an applicant agency can be either informal or formal, but necessarily requires that each agency "use the best scientific and commercial data available." *Id.* § 1536(a)(2). Informal consultation is an optional process, and includes all discussions between a federal agency and the Fisheries Service. If the Fisheries Service determines that an agency's proposed action is "not likely to adversely affect [endangered or threatened] species or critical habitat, the consultation process is terminated, and no further action is required." 50 C.F.R. § 402.13. If, on the other hand, the Fisheries Service determines that an agency's proposed action "may affect [endangered or threatened] species or critical habitat," then formal consultation is required. *Id.* § 402.14.

**C.     Summary**

Under the Clean Water Act, the EPA has the responsibility of approving or disapproving proposed state water-quality standards. Because the proposed standards in this case potentially affected certain endangered wild salmon populations, the Endangered Species Act required that the EPA consult with the Fisheries Service, either formally or informally, before reaching a final decision.

//

//

ORDER, C08-0156-JCC
Page 3

### III.   FACTUAL BACKGROUND

In 1991, the Washington State Department of Ecology proposed sediment-quality standards governing marine, low-salinity, and freshwater surface sediments. The proposed regulations imposed restrictions on the chemical composition of the marine sediments in the Puget Sound. *See* WASH. ADMIN. CODE § 173.204.320 (limiting the arsenic content of the Puget Sound to fifty-seven parts per million, *inter alia*). The EPA approved the State's regulations the same year. Plaintiff does not challenge these 1991 regulations.

Plaintiff challenges 1995 amendments to the regulations, which exempt Puget Sound salmon farms from various water-quality standards of general application. *See* WASH. ADMIN. CODE §  173.204.412 (exempting "marine finfish rearing facilities and their associated discharges" from "authority and purpose standards," "marine sediment-quality standards," "sediment impact zone maximum criteria," and "sediment impact zone standards"). The State Department of Ecology proposed the challenged regulations in December 1995, two years after the State Legislature passed a law requiring the Department to "adopt criteria . . . for allowable sediment impacts from organic enrichment due to marine finfish rearing facilities[,]" and to "adopt standards . . . for waste discharges from marine finfish rearing facilities." 1993 WASH. LEGIS. SERV. ch. 296, *codified at* WASH. REV. CODE § 90.48.220.

The EPA failed to approve or reject the 1995 amendments for more than ten years. In November 2007, Plaintiff notified the EPA that it intended to sue under the citizen-suit provision of the Clean Water Act unless the Agency promptly acted. (*See* Notice Letter (Dkt. No. 1 at 11–13)). The EPA's response was swift: By June 2008, the EPA and the Fisheries Service had determined that they could forego the lengthy formal consultation that the Endangered Species Act generally requires. Formal consultation was unnecessary, the federal agencies concluded, because the proposed regulations were unlikely to adversely affect endangered and threatened species or their critical habitat. On September 18, 2008, the EPA

1    therefore formally approved the State's proposed regulations and prepared a twenty-six-page
2    technical justification of the decision. (Approval Materials I.A (Dkt. No. 38)).

### A.  Scientific Data Used by the Federal Agencies

In concluding that the State's proposed regulations were unlikely to adversely affect threatened and endangered fish species, the EPA and the Fisheries Service primarily relied on three memoranda prepared by the National Oceanic and Atmospheric Administration. The first memorandum, titled *The Net-Pen Salmon Farming Industry in the Pacific Northwest*, was prepared in 2001. It identifies three issues as the greatest environmental risks from salmon farms: (1) the impact of fish feces and uneaten food on the environment below the net pens; (2) the impact on benthic communities of the accumulation of heavy metals in sediment below the pens; and (3) the impact on non-target organisms by the use of therapeutic compounds. (2001 Memorandum (Dkt. No. 52-4 at 80–99)). The report concludes that these risks can be most effectively mitigated by the responsible selection of fish-farm sites. (*Id.* (Dkt. No. 52-4 at 91)).

The second memorandum, titled *Review of Potential Impacts of Atlantic Salmon Culture on Puget Sound Chinook Salmon and Hood Canal Summer-Run Chum Salmon Evolutionarily Significant Units*, was prepared in 2002. It differs from the 2001 memorandum in that it addresses the effects of salmon net pens that are specific to the Puget Sound. With respect to water quality, the memorandum concludes that the Puget Sound's unique grading and tidal attributes ameliorate any adverse effects the net pens might otherwise cause. With respect to sea lice and their effects on wild salmon populations, the memorandum notes that sea lice have not been "reported to be a significant problem in marine net-pens in the Puget Sound." (2002 Memorandum 27 (Dkt. No. 52-5 at 101)).

The third memorandum, prepared in 2007, is titled *Beneficial Environmental Effects of Marine Finfish Mariculture*. As its title indicates, the memorandum focuses on the environmental *benefits* that flow from salmon net pens. It disputes the "popular media-

distributed notion" of fish-farming pens as "biological wastelands, heavily impacted by fish feces, waste feed, antibiotics and chemicals." (2007 Memorandum (Dkt. No. 52-5 at 80)). As the memorandum states:

> Nothing could be further from the truth for Washington State fish farms. . . . Antibiotics are rarely used (vaccines are used instead), no sea lice problems exist due to naturally reduced salinity levels, and farm siting involves locations with fast currents or relatively great depth that distribute wastes over large areas where they may be incorporated into the food web while maintaining aerobic surficial sea bottom sediments.

(*Id.*).

### B. Scientific Studies the Agencies Failed to Use

Plaintiff points to several scientific studies that the EPA and Fisheries Service failed to use during the informal consultation process. As discussed above, the agencies declined to engage in formal consultation because of their unlikely-to-adversely-affect conclusion. Plaintiff argues that this conclusion would have been different had the agencies considered, *inter alia*, a salmon recovery plan prepared by the Fisheries Service, and an orca recovery plan also prepared by the Fisheries Service.

#### a. Salmon Recovery Plan

The Fisheries Service is required to prepare "develop and implement [recovery] plans . . . for the conservation and survival of endangered species and threatened species[.]" 15 U.S.C. § 1633(f). In 2007, the Service adopted a recovery plan for the Chinook Puget Sound salmon. *See* 72 Fed. Reg. 2493–95 (Jan. 19, 2007). The salmon recovery plan reads in part:

> This plan was developed with a strong partnership between scientists and policy makers at local and regional levels. The intent behind such a partnership is to make the best decisions to achieve a future that supports people and the environment. This plan is based on years of scientific observation, testing of hypotheses, multiple lines of evidence, monitoring and learning. *The policy and technical elements in this plan incorporate the best available science to date for salmon recovery*.

(Salmon Plan 11–12 (Dkt. No. 52-3 at 8–9)) (emphasis added).

The salmon recovery plan specifically addresses the risks that commercial salmon farms create for wild salmon populations. It identifies two chief dangers: First, farmed salmon can escape their pens, and either interbreed with wild populations or compete with wild populations for food. The plan points to a 1997 accident in which three-hundred thousand farmed salmon escaped from a Washington facility. (Salmon Plan 4-30 (Dkt. No. 52-3 at 74)). Second, commercial salmon farms are likely to pollute the Puget Sound in ways that harm wild salmon populations. As the recovery plan states, "Four salmon net pens in the State of Washington in 1997 discharged ninety-three percent of the total amount of visible solids into Puget Sound." (*Id.*). It continues. "Discharges from salmon farms can also contain antibiotics and other chemicals that are used to kill salmon parasites." (*Id.*).

### b. Orca Recovery Plan

The Fisheries Service adopted a recovery plan for the orca whale in 2008. *See* 73 Fed. Reg. 4176–77 (Jan. 24, 2008). Because orca whales feed on wild salmon populations, the recovery plan discusses environmental threats to wild salmon. As it states, "Reductions in prey availability [*i.e.*, wild salmon] may force the whales to spend more time foraging and could lead to reduced reproductive rates and higher mortality." (Orca Plan II-72 (Dkt. No. 52-4 at 16)). Like the salmon recovery plan, the orca recovery plan describes itself as "*based on the best available science* and the current understanding of the threats." (*Id.* I-1 (Dkt. No. 52-4 at 9)) (emphasis added).

The orca recovery plan specifically discusses the dangers that commercial salmon farms create for the orca whale's chief prey: wild salmon. It states, "Concerns center primarily over 1) marine net-penned Atlantic salmon transmitting infectious diseases to adjoining wild salmon populations, and 2) escaped Atlantic salmon becoming established in the wild and competing with, preying on, or interbreeding with wild Pacific salmon." (*Id.* II-84 (Dkt. No. 52-4 at 28)). The plan ultimately concludes that improved fish-farming techniques have largely ameliorated these dangers. (*Id.*).

ORDER, C08-0156-JCC
Page 7

Finally, the recovery plan also discusses the possibility that farm-raised salmon can infect wild salmon populations with sea lice, although it declines to discuss the harms that sea lice might cause wild salmon. As the orca recovery plan states, "There is compelling evidence that sea lice . . . are transmitted from salmon farms to wild salmon, but the severity of impacts to wild fish remains uncertain." (*Id.* II-85 (Dkt. No. 52-4 at 29)). It continues, "Sea lice from farms have been linked to a decline of wild pink salmon populations in British Columbia's Broughton Archipelago, although this finding has been disputed and may simply reflect a normal downward fluctuation in the populations." (*Id.*).

## IV.   LEGAL STANDARD

The Endangered Species Act requires that all involved federal agencies "use the best scientific and commercial data available[.]" 16 U.S.C. § 1536(a)(2). This requirement prevents the haphazard implementation of the Act "on the basis of speculation or surmise[.]" *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003) (quoting *Bennett v. Spear*, 520 U.S. 154, 176 (1997)). The best available data requirement "prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (quoting *Southwest Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C.Cir. 2000)). Judicial review of administrative decisions is governed by the Administrative Procedure Act. *See* 5 U.S.C. § 706. This Court may set aside an agency action if it was, *inter alia*, "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990).

Summary judgment is appropriate if, after viewing the evidence in the light most favorable to the nonmoving party, the Court determines there are no genuine issues of material fact. FED. R. CIV. P. 56(c)(2). There is no genuine issue of fact for a trial where the record, taken as a whole, could not lead a rational finder of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court

must inquire into "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## V. DISCUSSION

The parties in this case have submitted lengthy briefs containing dozens of different arguments. They have filed an administrative record that spans thousands of pages. (*See* Administrative Record (Dkt. Nos. 34 & 38)). They have traded literary allusions, comparing the salmon and orca recovery plans to Holy Bible, and they have cited to literary works as far afield as William Shakespeare's HAMLET. (*See* Intervenor's Response 16 (Dkt. No. 56); Plaintiff's Reply 7 (Dkt. No. 62)). For the Court, however, this case boils down to a single fact, which reduces the bulk of the parties' lengthy arguments and filings to nothing more than "sound and fury, signifying nothing." WILLIAM SHAKESPEARE, MACBETH act 5 sc. 5.

The plain fact of the matter is that the Fisheries Service and EPA ignored a salmon recovery plan and an orca recovery plan that the Fisheries Service itself describes as "incorporat[ing] the best available science to date for salmon recovery[,]" and "based on the best available science[,]" respectively. They ignored these plans when concluding that proposed Washington State water-quality regulations were "not likely to adversely affect [wild salmon populations] or [their] critical habitat." It is difficult for the Court to square the agencies' failure to use the recovery plans with the requirement under the Endangered Species Act that federal agencies "use the best scientific and commercial data available." *See* 16 U.S.C. § 1536(a)(2). It goes without saying that the Fisheries Service's own recovery plans were available to the Fisheries Service when it reached its conclusion. Because the recovery plans constitute the best available science, and because the record demonstrates that the agencies failed to use them in reaching their decision, an obvious conclusion follows: The agencies failed to use the best available science in determining that formal consultation was unnecessary. The agencies thereby ran afoul of the Endangered Species Act.

1  The federal agencies state in their response brief that scientists with the Fisheries Service in fact "consider[ed] the recovery plans to the extent appropriate in conducting the consultation." (Defendant's Opp'n Brief 19–20 n.4 (Dkt. No. 59)). The Court cannot accept this unsupported assertion: It is black-letter administrative law that a reviewing federal court must uphold or strike down administrative action based upon those grounds "upon which *the record discloses* that [the] action was based." *Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (emphasis added). In this case, the record contains a letter from the Fisheries Service to the EPA concurring in the latter's conclusion that the proposed Washington State standards were "unlikely to adversely affect listed species." (Letter (Dkt. No. 52-2 at 7–14)). It concludes with a one-page list of the relevant scientific literature that the letter relies upon. Altogether, four sources are listed: the three memoranda prepared by the National Oceanic and Atmospheric Administration, and a report prepared by the Washington State Department of Natural Resources. (*Id.* (Dkt. No. 52-2 at 14)). Nowhere in the letter are the recovery plans discussed or cited. (*Id.*). In fact, the agencies have pointed to *nowhere in the record* that would demonstrate that they availed themselves of the recovery plans when reaching their decision. Given this dearth of support in the record, the Court cannot uphold the administrative action at issue based on an unsupported and nebulous assertion—offered for the first time in a brief's footnote—that scientists considered the plans "to the extent appropriate[.]"

The parties' lengthy briefs contain many other arguments, none of which affects the Court's holding. For example, Intervenor argues that principles of collateral estoppel preclude Plaintiffs from litigating this matter in the first place. Intervenor notes that the Washington State Pollution Control Hearings Board rejected Plaintiff's 1998 argument that the state water-sediment standards endanger wild salmon populations. (*See* Intervenor Response 17–19 (Dkt. No. 56)). The state hearing went to the merits of a state agency's decision, however, whereas this matter deals with whether federal agencies have complied with federal procedural

1    requirements. Collateral estoppel therefore does not apply. *See Steen v. John Hancock Mut. Life*
2    *Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997) (stating that "[t]he party asserting collateral estoppel
3    must first show that the estopped issue is identical to an issue litigated in a previous action").

4    　　　　The parties also argue about what standard federal agencies should apply when
5    determining whether formal consultation is required under the Endangered Species Act.
6    Plaintiff argues that formal consultation is required whenever proposed federal action "may
7    affect listed species or their critical habitat." (Plaintiff's Motion 13 (Dkt. No. 52)). Defendants
8    and Intervenor argue instead that formal consultation is only necessary if a proposed federal
9    action "may affect" and is "likely to adversely affect" a listed species or its critical habitat.
10   (Defendant's Opp'n 13 (Dkt. No. 59)); (Intervenor Opp'n 21 (Dkt. No. 56)).

11   　　　　The Court need not resolve this issue: The Endangered Species Act unambiguously
12   declares that federal agencies must "use the best scientific and commercial data available." *See*
13   16 U.S.C. § 1536(a)(2). Because the agencies failed to use the best data available, the Court
14   must set aside their determination, regardless of whether they applied the correct legal
15   standard. Principles of judicial forbearance counsel against further discussion. *See Chevron*
16   *U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (stating that federal
17   courts defer to an agency's reasonable construction of a statute Congress has delegated it
18   authority to administer).

19   　　　　Similarly, this Court need not decide whether the Puget Sound's salmon farms actually
20   infect wild salmon populations with sea lice, or whether sea lice create a danger for wild
21   salmon. (*See, e.g.,* Plaintiff's Motion 30–32 (Dkt. No. 52)). Also unnecessary is discussion
22   about those parts of the recovery plans that do not mention salmon farming. (*See* Intervenor's
23   Opp'n 15–16 (Dkt. No. 56)). This case is actually relatively straight-forward: When making
24   decisions that require them to "use the best available scientific and commercial data available,"
25   the Fisheries Service and the EPA failed to use recovery plans that the Fisheries Service itself
26   describes as containing the "best scientific evidence available." For this reason, the Court must

set aside the agencies' conclusion—which they reached after informal consultation—that the Washington State proposed water-quality regulations are "not likely to adversely affect [endangered or threatened] species or critical habitat."

## VI. CONCLUSION

For the reasons explained above, the Court hereby GRANTS Plaintiff's motion for summary judgment. (Dkt. No. 52). The Court therefore SETS ASIDE the EPA's 2008 decision to approve Washington State's proposed water-quality standards dealing with salmon farms. The Court ORDERS the Fisheries Service and the EPA to re-consider whether formal consultation is required—this time taking into account the best available science.

For the same reasons explained above, the Court hereby DENIES Defendant's cross-motion for summary judgment. (Dkt. No. 59).

SO ORDERED this 28th day of April, 2010.

JOHN C. COUGHENOUR
United States District Judge